SEAN P. REIS (No. 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RYAN D. ANDREWS (*Pro Hac Vice*)
randrews@edelson.com
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JUVENAL ROBLES and ABEL FIGUEROA, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br><br>LUCKY BRAND DUNGAREES, INC., a Delaware corporation, et al.,<br><br>Defendants. | Case No. 10-cv-04846 MMC (HRL)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Location: Courtroom 7, 19th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br>Date: May 10, 2013<br>Time: 9:00 a.m.<br><br>The Honorable Maxine M. Chesney<br><br>Magistrate Judge Howard R. Lloyd |

# NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that the Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e) and this Court's Order of November 26, 2012 (dkt. 97), to grant Final Approval of this Class Action Settlement on May 10, 2013 at 9:00 a.m., or at such other time as may be set by the Court, at 450 Golden Gate Avenue, San Francisco, CA 94102, Courtroom 7, 19th Floor, before the Honorable Maxine M. Chesney.

Plaintiffs respectfully request that this Court grant its Motion for Final Approval of Class Action Settlement. The Motion is based on this Notice of Motion, the Brief in Support of the Motion attached hereto and the authorities cited therein, oral argument of counsel, and any other matter that may be submitted at the hearing.

Dated: April 26, 2013

Respectfully submitted,

JUVENAL ROBLES and ABEL FIGUEROA, individually and on behalf of a class of similarly situated individuals,

By: _/s/ Ryan D. Andrews_

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RYAN D. ANDREWS (*Pro Hac Vice*)
randrews@edelson.com
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

SEAN P. REIS (No. 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE FACTS, THE LAW, AND THE LITIGATION HISTORY ............................ 3

III.    TERMS OF THE SETTLEMENT AGREEMENT ............................................... 6

    A.      Class Definition ...................................................................................... 6

    B.      Monetary Relief ...................................................................................... 6

    C.      Prospective Relief ................................................................................... 7

        1.      *Obtaining Prior Express Consent* ............................................. 7

        2.      *Class Member List Removal and Review of Current Laws* ...... 7

    D.      Other Relief ............................................................................................ 7

        1.      *Payment of Notice and Settlement Administrative Expenses* ... 7

        2.      *Compensation for the Class Representatives* ........................... 8

        3.      *Payment of Attorneys' Fees and Expenses* .............................. 8

    E.      Release .................................................................................................... 8

IV.     THE NOTICE PLAN COMPORTS WITH DUE PROCESS ............................... 8

V.      THE SETTLEMENT WARRANTS FINAL APPROVAL .................................. 10

    A.      The Strength of Plaintiffs' Case .......................................................... 12

    B.      The Risk of Continued Litigation ........................................................ 14

    C.      The Risk of Maintaining Class Action Status ..................................... 15

    D.      The Amount Offered in Settlement ...................................................... 16

    E.      The Extent of Discovery Completed and the Stage of Litigation ....... 18

    F.      The Experience and Views of Counsel ................................................ 21

    G.      The Presence of a Governmental Participant ....................................... 22

    H.      The Reaction of Class Members to Date ............................................. 22

    I.      There is No Evidence of Collusion ...................................................... 22

VI.     CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)...................................................... 8

*Evans v. Jeff D.*, 475 U.S. 717 (1986) .......................................................................... 9

*Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147 (1982)................................................. 15

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012) .............................................. 4

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)........................................... 16

**United States Circuit Court of Appeals Cases**

*Churchill Vill, L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .................. 11, 14, 22

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)............................. 11

*Gene and Gene, LLC v. Biopay LLC,* 541 F.3d 318 (5th Cir. 2008) ......................... 13

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................... 11, 16

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .... 22, 23, 24, 25

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ..................... 14, 18, 22

*In re Pac. Enters. Sec. Litig.,* 47 F.3d 373 (9th Cir. 1995) ....................................... 20

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ....................................... 11, 17

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ............................. 18

*Malchman v. Davis*, 761 F.2d 893 (2nd Cir. 1985)................................................... 24

*Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338 (9th Cir. 1980).......................... 9

*Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of S.F.*,
        688 F.2d 615 (9th Cir. 1982)......................................................... 11, 14

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir. 2003)........................ 18

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000) ..................................................... 23

*Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010) ................................................. 8

*Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948 (9th Cir. 2009) ..................... 11, 12, 14, 15

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ................. 4, 17, 21

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ........................................................... 8

1    *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ........................................................ 23

2

3    **United States District Court Cases**

4    *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) ........................................ 13, 16

5    *Bellows v. NCO Fin. Sys., Inc.*,

6         No. 07-CV-01413, 2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) .............................. 13, 19

7    *Blanco v. CEC Entm't Concepts L.P.*,

8         No. 07-CV-0559, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008) ........................................ 18

9    *Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ............................................................ 20

10    *Bridgeview Heath Care Ctr. Ltd. v. Clark*,

11         No. 09-CV-05601, 2011 WL 4585028 (N.D. Ill. Sept. 30, 2011) .................................... 13

12    *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) .............................. 22

13    *Espinal v. Burger King, Corp.*, No. 09-CV-20982 (S.D. Fla.)................................................. 17, 24

14    *Gardner v. GC Servs., LP*,

15         No. 10-CV-0997, 2012 WL 1119534 (S.D. Cal. Apr. 2, 2012) .................................. 15, 18

16    *Garner v. State Farm Mut. Auto Ins. Co.*,

17         No. 08-CV-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ............................*passim*

18    *Green v. DirecTv, Inc.*, No. 10-CV-117, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010)................ 13

19    *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011).......................... 13

20    *Harris v. Vector Mktg. Corp.*,

21         No. 08-CV-5198, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) .................................... 19

22    *Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011).............................................................. 24

23    *In re Critical Path, Inc.*,

24         No. 01-CV-00551, 2002 WL 32627559 (N.D. Cal. June 18, 2002) ................................ 16

25    *In re Facebook Privacy Litig.*, No. 10-CV-02389 (N.D. Cal. Dec. 10, 2010) ............................ 21

26    *In re HP Laser Printer Litig.*,

27         No. SACV 07-0667 AG RNBX, 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ....... 23, 25

28    *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) .................... 4

1   *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................ 14, 18, 20

2   *In re Patriot Am. Hospitality Inc. Sec. Litig.*,

3        MDL 00-1300, 2005 WL 3801594 (N.D. Cal. Nov. 30, 2005)................................... 18-19

4   *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985) ......................................... 19

5   *Jaffe v. Morgan Stanley & Co.*,

6        No. 06-CV-3903, 2008 WL 346417 (N.D. Cal. Feb.7, 2008)........................................... 16

7   *Kim v. Space Pencil, Inc.*,

8        No. 11-CV-03796, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ................................ 14

9   *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010) ................................................. 4

10   *Kramer v. Autobytel, Inc.*, No. 10-CV-2722 (N.D. Cal. 2012) ............................................. 17, 24

11   *Lee v. Stonebridge Life Ins. Co.*, --- F.R.D. ----,

12        No. 11-CV-0043 RS, 2013 WL 542854 (N.D. Cal. Feb. 12, 2013).......................... 12, 16

13   *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ....................................... 14

14   *Lozano v. Twentieth Century Fox*, No. 09-CV-6344 (N.D. Ill. 2011) ...................................... 17

15   *Martin v. AmeriPride Servs., Inc.*,

16        No. 08-CV-440, 2011 WL 2313604 (S.D. Cal. June 9, 2011) ............................ 14, 16, 20

17   *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009) ................... 24

18   *Nabal v. BJ's Wholesale Club, Inc.*,

19        No. 02-2604, 2002 WL 32349137 (E.D. Pa. Aug. 2, 2002)............................................ 24

20   *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

21        221 F.R.D. 523 (C.D. Cal. 2004) ................................................ 10, 12, 20, 22

22   *Odrick v. UnionBancal Corp.*,

23        No. 10-CV-5565, 2012 WL 6019495 (N.D. Cal. Dec. 3, 2012) ...................................... 19

24   *Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537 (W.D. Wash. 2009) ......................................... 22

25   *Rojas v. Career Educ. Corp.*, No. 10-CV-5260 (N.D. Ill. 2012) .......................................... 17

26   *Ross v. Trex Co., Inc.*, No. 09-CV-00670, 2013 WL 791229 (N.D. Cal. Mar. 4, 2013) ............... 8

27   *Satterfield v. Simon & Schuster*, No. 06-CV-2893 (N.D. Cal. 2010) ......................................... 17

28   *Schiller v. David's Bridal, Inc.*,

No. 10-CV-00616, 2012 WL 2117001 (E.D. Cal. June 11, 2012)..............................11-12

*Shames v. Hertz Corp.*, No. 07-CV-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ....... 12, 22

*Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ............................................. 13

*Weinstein v. The Timberland Co. et al.*, No. 06-CV-00484 (N.D. Ill. 2008) ............................... 17

*Wren v. RGIS Inventory Specialists*,

      No. 06-CV-05778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ............................. 10, 25

*Young v. Polo Retail, LLC*,

      No. 02-CV-4546, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007)...................................... 15


**State Court Cases**

*In re Consumer Privacy Cases*, 175 Cal. App. 4th 545 (Cal. Ct. App. 2009) ............................ 24


**Statutes, Rules and Regulations**

47 U.S.C. § 227 ................................................................................................................ 4, 12

Fed. R. Civ. P. 23 ........................................................................................................... 8, 9, 10


**Other Sources**

Alba Conte & Herbert B. Newberg, Newberg on Class Actions (4th ed. 2002)............................ 9

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist*

      *and Plain Language Guide* (2010).................................................................................. 9

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

      7 FCC Rcd. 8752 (1992) ............................................................................................. 13

Manual for Complex Litigation*, Third (1995) ......................................................................... 11

Manual for Complex Litigation, Fourth (2004) ........................................................................ 11

4 William B. Rubenstein, Alba Conte, & Herbert B. Newberg,

      *Newberg on Class Actions* (4th ed. West 2011)......................................................... 12

## I.  INTRODUCTION

The never-ending demand for newer, quicker, and cheaper ways to reach consumers has led to the development of marketing and advertising tactics that oftentimes forego strict targeting in favor of reaching the largest swath of consumers practicable.  To that end, companies are quick to capitalize on emerging technologies, especially those that allow them to transmit their advertisements and solicitations to the consumers' most accessible, near constant companion— their cellular phones.  Text message marketing, or "SMS" marketing, allows businesses to send short text messages to the cellular phones of consumers, often inviting them to take advantage of incredible deals or visit websites for more details about their products.  However, in their quest to reach the wallets and purses of consumers, some advertisers neglect to consider the consent of the consumer to receive these text message offers.  In fact, a recent Pew study indicates that 69% of consumers have been the recipients of an unsolicited text message advertisement at some point.[1]

This litigation and the resultant Settlement Agreement[2] (which can be found in full at dkt. 95-1) represent an effort by consumers to stem the tide of allegedly unsolicited text messages and encourage advertisers to employ the best practices possible when sending out ads and solicitations. In the summer of 2008, Plaintiffs Juvenal Robles and Abel Figueroa ("Plaintiffs") became just two of 216,711 cellular phone users who were allegedly sent unsolicited text messages promoting Defendant Lucky Brand Dungaree's signature jeans as part of its "Back to School" mobile marketing campaign.  (Dkts. 1, 39.)  Through their Amended Complaint, Plaintiffs alleged that Lucky Brand Dungarees, Inc. ("Lucky"), working alongside advertisers Kirshenbaum Bond Senecal & Partners LLC f/k/a Kirshenbaum Bond & Partners LLC d/b/a Lime Public Relations + Promotion, and Kirshenbaum Bond & Partners West LLC (together "Lime"), Third-Party Defendant Merkle, Inc. ("Merkle"), and Fourth-Party Defendant RGAR Holdings, LLC f/k/a Take

---

[1]  *See* Jan L. Boyles and Lee Rainie, *Mobile Phone Problems*, Pew Internet (Aug. 2, 2012), http://www.pewinternet.org/Reports/2012/Mobile-phone-problems/Main-findings/Mobile-phone-problems.aspx.

[2]  All capitalized terms retain their meaning as defined in the Class Action Settlement Agreement.  (*See* Dkt. 95-1.)

5 Solutions, LLC ("Take 5") (Lucky, Lime, Merkle, and Take 5 are collectively referred to as the "Defendants") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"), when they allegedly caused the transmission of these unsolicited text messages to the cellular phones of more than two hundred thousand consumers.

Now, in the wake of over two years of litigation, multiple settlement conferences presided over by Magistrate Judge Howard R. Lloyd and mediation with the late Honorable Nicholas H. Politan (Ret.), as well as multiple rounds of arm's-length negotiations, the Parties have reached the instant Settlement Agreement for which they seek final approval pursuant to Federal Rule of Civil Procedure 23(e). On November 26, 2012, this Court granted preliminary approval to the Settlement, finding the accompanying Notice Plan to be "the best notice practicable under the circumstances," as well as fully compliant with both Rule 23 and Due Process. (Dkt. 97, ¶ 8.)

The Settlement Administrator has since successfully implemented the Notice Plan, and the deadlines for submitting requests to be excluded or for objecting to the Settlement have now expired. The reaction to the Settlement by members of the Class ("Class Members") has been overwhelmingly favorable—only two Class Members have requested to be excluded, and most notably, not a single Class Member has objected to the Settlement. Such a favorable reception from Class Members is undoubtedly tied to the exceptional results achieved for the Class through this Settlement.

First, each Class Member who received a text message promoting Lucky's "Back to School" campaign, and who submitted a short and simple Claim Form by April 19, 2013, is eligible to receive up to a $100 settlement payment distributed from the $9,990,000 Settlement Fund. This Settlement Fund has already been used to pay administrative expenses, the costs of effectuating proper notice to the Class and, should the Court grant final approval, will be used to pay Class Members' claims, incentive awards to the Class Representatives, and attorneys' fees and expenses. In addition to the monetary benefits, Defendants Lime, Merkle, and Take 5 have agreed to prospective relief that requires them to procure, through the use of a clear and conspicuous statement, the written consent of consumers to receive any text message advertisements. Class Members also have the option of having their cell phone numbers completely removed from the

database of numbers in Take 5's possession. Finally, although Lucky has indicated it never intends to use text message advertising again, both it and its agents are required to review all current laws and regulations surrounding text message advertising prior to any future campaigns to ensure they are not participating in the transmission of unsolicited text messages.

In moving for final approval, Plaintiffs and Class Counsel are confident in the strength of the Settlement and the exceptional results it achieves. The $100 payments made available to the Class from the near $10 million fund, the tailored prospective relief, the lack of any objections, and the inherent risk attendant in continued litigation of a complex class action each favor final approval of this Settlement. In addition, the Court need not rule on a blank slate in deciding the fairness, reasonableness, and adequacy of this agreement, as it is predicated on similar agreements approved in federal courts nationally. Accordingly, Plaintiffs respectfully request that this Court grant final approval of the Agreement and dismiss the Released Claims and Cross Claims with prejudice.

## II.    THE FACTS, THE LAW, AND THE LITIGATION HISTORY

In the summer of 2008, Lucky sought to promote its Lucky Brand Dungarees through a "Back to School Campaign" which invited customers to take advantage of sales and discounts on its signature line of jeans.[3] To effectuate this campaign Lucky hired Lime, a marketing and advertising company, who in turn hired Merkle, a company specializing in text-message marketing. Merkle then hired Take 5 to provide it with a list of cellular telephone numbers to which the text messages could be sent. The result of this collaboration was the transmission of the "Back to School" text messages to the cellular phones of Plaintiffs and 216,709 other consumers. On October 26, 2010, Plaintiff Robles brought a single-count complaint against Lucky claiming a violation of the TCPA based on his receipt of one of the text messages, which he alleged was sent without his prior express consent.

---

[3]    While this section provides a thorough and adequate recounting of the facts relating to the litigation of this case, a more detailed account of the facts was also set forth in Plaintiff's Motion for Approval of Attorneys' Fees and Expenses and Class Representatives' Incentive Awards. (*See* Dkt. 99.)

Congress enacted the TCPA in response to "voluminous consumer complaints" concerning "intrusive nuisance calls" made by automated telemarketing practices that it determined intruded upon the privacy of individuals. *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012). Through the TCPA, Congress made it "unlawful . . . to make any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service. . . ." 47 U.S.C. § 227(b)(1)(A)(iii); *Mims*, 132 S. Ct. at 745. Subsequent decisions have held that the TCPA applies with equal force to the making of text message calls as it does to the making of voice calls to cellular phones. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1170 (N.D. Cal. 2010). The result of violating the TCPA is a statutory penalty of $500 per message or call, as well as the availability of an injunction prohibiting the further transmission of such messages. 47 U.S.C. § 227(b)(3)(A-B). In addition, liability under the TCPA extends not only to the entity that physically transmitted the text messages, but also to any party responsible for the text messages. *Kramer,* 759 F. Supp. 2d at 1170 (N.D. Cal. 2010); *In re Jiffy Lube Int'l, Inc. Text Spam Litig*, 847 F. Supp. 2d 1253, 1256-58 (S.D. Cal. 2012).

In answering Plaintiff Robles's original complaint, and in subsequent discussions, Lucky maintained the strength of a number of its defenses, including the insistence that Plaintiff Robles had consented to receive the text messages at issue and that it could not be held liable for texts made by others on its behalf. (*See* Dkt. 15.) At the outset, Judge Fogel ordered Class Counsel and Counsel for Lucky to participate in a settlement conference with Magistrate Judge Howard Lloyd in an effort to encourage frank settlement discussions. (*See* Dkt. 18.) Lucky's indication of Lime, Merkle, and Take 5's involvement in the alleged "Back to School" marketing campaign necessitated their attendance at the conference as well, and the Parties agreed to the production of relevant discovery documents to aid in the negotiating process. (*See* Dkt. 32.) Though an actual settlement was still far off at this point, the resulting conference was productive, and the merits of the claims and defenses at issue were discussed fairly and openly. (Dkt. 99-1, ¶¶ 5-7.)

In the months following the conference, Class Counsel successfully obtained the list of text message recipients. (Dkt. 99-1, ¶ 9.) This discovery, as well as further investigatory efforts,

permitted Plaintiff Robles to amend his complaint on July 25, 2011 and add Defendant Lime as well as additional Plaintiff Figueroa. (*See* Dkt. 39.) On September 6, 2011, Lime answered the Amended Complaint and simultaneously filed a Third-Party Complaint against Merkle seeking indemnification and making additional claims of its own. (Dkt. 44.) Three days later, Lucky also answered the Amended Complaint. (Dkt. 48.) Like Lime, Merkle filed its answer to Lime's Third-Party Complaint on November 7, 2011, and then on November 21, filed a Fourth-Party Complaint against Take 5. (Dkts. 64, 66.) On February 28, 2012, Take 5 answered Merkle's Fourth-Party Complaint. (Dkt. 72.)

In the meantime, Plaintiffs issued several sets of discovery, including multiple interrogatories and requests for production on each Defendant, as well as subpoenas issued on third parties with knowledge of the text messages transmitted by Defendants. (Dkt. 99-1, ¶ 11.) Then, on September 21, 2011, the Parties once again appeared before Judge Lloyd and attempted to negotiate a compromise. (Dkt. 53.) Though significant progress was made toward a resolution, including discussions of the structure of settlement and Class Member payment amounts, disagreement remained regarding allocation of settlement funding among the Defendants and insurers. (Dkt. 95-1, Recital D; dkt. 99-1, ¶ 14.) Nevertheless, encouraged by these continuing discussions, the Parties agreed to follow up this conference with a one-day intensive round of private mediation with Judge Politan. (Dkt. 95-1, Recital D.)

On January 26, 2012, the Parties met and engaged in several rounds of arm's-length negotiations led by Judge Politan. (Dkt. 95-1, Recital D.) In advance of their mediation, the Parties submitted detailed statements setting forth their respective positions on the litigation, evidence supporting their positions, and their views on settlement. (Dkt. 99-1, ¶ 15.) When at the end of the day the Parties reached an impasse, Judge Politan made a mediator's proposal detailing a list of key provisions he believed would result in a fair settlement. (*See* Dkt. 99-1, ¶ 17; dkt. 78 ¶ 12.) On February 20, 2012, while the Parties were still considering his proposal, Judge Politan passed away. (Dkt. 95-1, Recital D.) Though not all of the Parties were able to agree to all of the terms presented in the mediator's proposal, they nonetheless pressed forward with settlement negotiations in parallel with discovery and planned on engaging in a fourth meditation. (*See* Dkts.

83, 86, 89.) It was at this point, on the cusp of a fourth mediation, that the Parties were finally able to reach an agreement in principle. (Dkt. 95-1, Recital D; dkt. 99-1, ¶ 18.) The Settlement now before the Court is the direct result of these multiple settlement conferences, formal and informal discovery efforts, and the mediation and subsequent mediator's proposal crafted by Judge Politan. (Dkt. 99-1, ¶¶ 19-20.)

On October 5, 2012, Plaintiffs submitted their Motion for Preliminary Approval of Class Action Settlement (dkt. 95), which this Court granted on November 26, 2012. (Dkt. 97.) The deadline for objections has since passed without a single Class Member objecting to the Settlement, and with only two Class Members opting to be excluded.

## III.    TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement that received preliminary approval by this Court, which are set forth in full in the Settlement Agreement submitted along with Plaintiffs' Motion for Preliminary Approval (dkt. 95-1), are briefly summarized below:

### A.    Class Definition

At preliminary approval, the Court certified a Settlement Class comprised of all Persons Nationwide who, from August 24, 2008 until September 15, 2008, were sent one of nine text messages—which are listed in the Settlement Agreement—from short code "88202" promoting Lucky's jeans as part of its "Back to School" campaign. (Dkts. 97, ¶ 5; 95-1, §§ 1.37, 1.42.)

### B.    Monetary Relief

The Settlement Agreement executed by the Parties requires Defendants to establish a $9,900,000 Settlement Fund from which each Settlement Class Member who submits a valid Claim Form will receive a payment of $100. (Dkt. 95-1, §§ 1.38, 2.2.) In the event the amount required to pay each approved claim would have exceed the amount in the settlement fund after payment of settlement administration expenses, the award to Class Counsel, and the incentive award to be shared between Class Representatives Robles and Figueroa—which it did not—then each Settlement Class Member would have received a *pro rata* share of the remaining fund. (*Id.* § 2.2(a).)

## C.    Prospective Relief

In addition to monetary payments to Class Members, the Settlement Agreement also provides strong prospective relief aimed at dramatically altering Defendants' marketing and advertising practices in order to eliminate the complained of conduct.  This includes:

1.    ***Obtaining Prior Express Consent***:  Defendants Lime, Merkle, and Take 5 have agreed to institute certain best practices which prohibit them, or any company with whom they contract, from advertising any offer, product, or service via text messages, unless each potential recipient has given explicit consent in the form of a clear and conspicuous writing prior to the receipt of any such messages.  (*Id.* § 2.3.)

2.    ***Class Member List Removal and Review of Current Laws***:  Every claim form has afforded Settlement Class Members the opportunity to permanently remove their cell phone numbers from any list or database of numbers to which text messages could be sent by or on behalf of Take 5.  (*Id.* § 2.4.)  Lucky has also stated it does not plan to engage in the transmission of text message in the future, but if it should, Lucky and its agents shall review all current laws and regulations surrounding the transmission of text message advertisements to consumers. (*Id.* § 2.3.)

## D.    Other Relief

In addition to the individual monetary and prospective relief detailed above, Defendants have also agreed to the following relief:

1.    ***Payment of Notice and Settlement Administrative Expenses***:  Defendants have paid for the cost of sending notice from the Settlement Fund, including the cost of identifying the last known addresses of Class Members beyond those identified in the Class List, the cost of sending direct mail and email notice with an accompanying Claim Form, the cost of establishing and maintaining the Settlement Website, the cost of a joint press release, and the cost of providing CAFA Notice to the Attorneys General of each U.S. State, the Attorney General of the United States, and other required government officials under 28 U.S.C. § 1715, as well as the costs of administration of the settlement.  (*Id.* § 4.2.)

**2.** ***Compensation for the Class Representatives***:  In addition to any award under the Settlement, and in recognition for their time and effort on behalf of the proposed Settlement Class, Defendants have agreed to provide Class Representatives Robles and Figueroa, subject to Court approval, an incentive award in the amount of $20,000 to be split evenly amongst them.  (*Id.* § 8.3.)  Defendants have agreed that such an award is reasonable and that they will not oppose the award either directly or indirectly.  (*Id.*)

**3.** ***Payment of Attorneys' Fees and Expenses***:  Under the Settlement Agreement and subject to the Court's approval, Defendants have agreed as reasonable and not to oppose Class Counsel's request of up to $2,400,000 for attorneys' fees and reimbursement of expenses.  (*Id.* § 8.1.)  On March 22, 2013, Plaintiffs filed their Motion for Approval of Attorneys' Fees and Expenses and Class Representatives' Incentive Awards.  (*See* Dkt. 99.)  A copy of this Motion was posted on the Settlement Website the same day it was filed.

**E.     Release**

In exchange for the relief provided above, and upon the entry of a final order approving this Settlement, the Defendants and each of their related affiliates and entities will be released from any claims, whether known or unknown, arising out of or relating to the alleged sending of the Text Messages to the Settlement Class defined above.  (*See* Dkt. 95-1, §§ 3, 1.28-1.31 for the full release language.)  Defendants are also releasing the Cross Claims against each other.

**IV.     THE NOTICE PLAN COMPORTS WITH DUE PROCESS**

Before granting final approval of this Settlement, the Court is obligated to determine whether the notice provided to the Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); accord *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994).  These safeguards are designed to ensure that notice to the class complies with both Rule 23 and the demands of due process.  *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010).  Comporting with these standards does not require that every individual class member receive *actual* notice however, only that the notice be "reasonably calculated under the circumstances to apprise [class members] of the

pendency of the class action and give [them] a chance to be heard." *Ross v. Trex Co., Inc.*, No. 09-CV-00670, 2013 WL 791229, at *1 (N.D. Cal. Mar. 4, 2013). Finally, the Federal Judicial Center has determined that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010).

As for its contents, notice is satisfactory where it "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980) *disapproved of on other grounds by Evans v. Jeff D.*, 475 U.S. 717, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986); *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:53 at 167 (4th ed. 2002) (notice is "adequate if it may be understood by the average class member."). Rule 23 requires that the notice must set forth the nature of the action, define the class to be certified, identify the class claims and defenses at issue, and also explain to class members that they may enter an appearance through counsel if so desired, request exclusion from the settlement class, and that any judgment will be binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Following preliminary approval, the Parties, with the assistance of professional settlement administrator Kurtzman Carson Consultants LLC ("KCC"), faithfully adhered to the requirements of the Settlement, Rule 23, Due Process, and this Court's Order by constructing and implementing a Notice Plan that included direct mail notice, email notice, the creation of a Settlement Website, and a joint press release. (Dkt. 97; Declaration of Jeff Gyomber, ("Gyomber Decl.") attached hereto as Exhibit 1, ¶¶ 5-13.) In order to establish the identity of Class Members and ensure that direct mail and email notice were especially effective, Plaintiffs engaged in discovery that resulted in the production of a list containing the 216,711 cellular telephone numbers to which the Text Messages were sent. (Dkt. 99-1, ¶ 9.) From there, KCC was able to use a combination of reverse cell phone look-up searches to send 152,998 direct mail notices and 377,082 email notices to members of the Settlement Class. (Gyomber Decl. ¶¶ 6, 12, 13.) This direct and email notice proved especially effective, resulting in a rate of 72.12% of Class Members receiving direct notice and allowing the Parties to supplement with a joint press release. (*Id*. ¶ 18.) Finally, on October

15, 2012, in compliance with the Class Action Fairness Act, 28 U.S.C. § 1715(b), Defendants mailed a letter enclosing the requisite court documents to the U.S. Attorney General and the Attorneys General of each state and U.S. territory giving notice of the Settlement. (*Id.* ¶ 4.)

The direct mail and email notice, CAFA Notice, and joint press release all provided links to, or the address for, the Settlement Website URL www.BackToSchoolTextSettlement.net, which went live on December 10, 2012. (*Id.* ¶ 10.) The website provides the traditional "long form" notice of the Settlement and allows for members of the Class to obtain additional information and documents about the Settlement, including a .pdf file of the Long Form Notice, Court documents, Motion for Approval of Attorneys' Fees and Expenses and Class Representatives' Incentive Award, and Frequently Asked Questions. (*Id.*) The website also provided full details regarding the rights of Class Members to object to or opt-out of the Settlement, notified Class Members that no further notice would be provided to them and that they should monitor the Settlement Website for further developments, and informed them that the Settlement had been preliminarily approved. All told, the Notice Plan achieved its projected saturation through direct notice alone. (*Id.* ¶ 18.)

Finally, in addition to implementing the methods of notice that resulted in reaching the greatest number of Class Members possible, the content of the notice was specifically designed so that it used simple, plain language encouraging readership and comprehension. (Gyomber Decl. ¶ 18.) In sum, notice to the Class complied with the Court's Preliminary Approval Order, its requested revisions, Rule 23, and Due Process, plainly comprising the "best practicable notice under the circumstances."

## V.     THE SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e) provides that a class action shall not be dismissed or compromised without the approval of the court. Fed. R. Civ. P. 23(e); *Wren v. RGIS Inventory Specialists*, No. 06-CV-05778, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011). Having already determined that the settlement warrants preliminary approval, the final step in the approval process requires the court to make a final fairness determination. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing Manual for Complex Litigation, Third, § 30.41, at 236-37 (1995)). At this second, final approval stage, the court's analysis focuses on whether the

proposed class action settlement "is fundamentally fair, adequate, and reasonable." *Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983)).  A settlement typically meets these criteria where "the interests of the class are better served by the settlement than by further litigation." *Garner v. State Farm Mut. Auto Ins. Co.*, No. 08-CV-1365, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (quoting Manual for Complex Litigation, Fourth § 21.61 (2004)).  The decision to approve or reject the settlement rests soundly with the trial judge, though courts should give proper deference "to the private consensual decision of the parties." *Garner*, 2010 WL 1687832, at *8 (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution. . . .")).  In general though, the Ninth Circuit has recognized that there is a "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned."  *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992).

In determining if a settlement satisfies the above criteria, the trial court examines: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill Vill, L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998)); *see also Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012).  No one factor carries more weight than others, and the importance of each factor will depend on "the unique facts and circumstances presented by each individual case."  *Officers for Justice*, 688 F.2d at 625.

In the Ninth Circuit, "[s]ettlements are afforded a presumption of fairness if (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Schiller v. David's Bridal, Inc.*, No. 10-CV-00616, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012), *report and recommendation adopted* June 28, 2012 (citing 4 William B. Rubenstein, Alba

Conte, & Herbert B. Newberg, *Newberg on Class Actions* § 11.41 (4th ed. West 2011)).

### A. The Strength of Plaintiffs' Case

The first factor courts analyze is the strength of the plaintiff's case, which requires a balancing of the "likelihood of success on the merits and the range of possible recovery." *Garner*, 2010 WL 1687832, at *9; *see also Shames v. Hertz Corp.*, No. 07-CV-2174, 2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012) (this analysis requires balancing "the vagaries of litigation and [] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (citing *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526). This analysis, however, does not require the Court to conduct a "speculative measure of what might have been awarded in a judgment in favor of the class," or "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D at 526 (citations omitted). Additionally, in light of the numerous subjective criteria that necessarily handicap the potential range of recovery, "the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff[s'] likelihood of recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

Plaintiffs and Class Counsel are confident in the strength of their claims and believe that if the case were to proceed to summary judgment or to trial, they would likely succeed on the merits. Further, if Plaintiffs were to succeed at trial the potential recovery for the Class would be significant to say the least. Given that the TCPA provides for $500 in damages for each violation and there are over 216,000 Class Members, the potential recovery totals well over one hundred million dollars. *See* 47 U.S.C. § 227(b)(3)(B). Recent precedent involving similar facts indicates that Plaintiffs would have a strong chance of succeeding in both adversarial class certification and at summary judgment. *Lee v. Stonebridge Life Ins. Co.,* --- F.R.D. ----, No. 11-CV-0043 RS, 2013 WL 542854, at *4 (N.D. Cal. Feb. 12, 2013) (certifying a nationwide class in a TCPA text message action); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 572 (W.D. Wash. 2012)

(certifying both a national and state subclass in a TCPA text message action); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727-28 (N.D. Ill. 2011) (denying defendant's motion for summary judgment); *Bridgeview Heath Care Ctr. Ltd. v. Clark*, No. 09-CV-05601, 2011 WL 4585028, at *6 (N.D. Ill. Sept. 30, 2011) (same).

Nonetheless, all Defendants have repeatedly argued that they would either defeat class certification by arguing that consent is an individual issue rendering certification improper, or that they would ultimately prevail on the merits because the TCPA violates the First Amendment and Due Process and because they could not be liable because they did not actually "make" the calls at issue or approve their content. To this end, Lucky set forth thirty affirmative defenses in its Answer, and Lime set forth thirty-one. Plaintiffs recognize that some judicial authority exists supporting Defendants' arguments. *See, e.g.*, *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1085-86 (C.D. Cal. 2012) (declining to extend the TCPA liability to entity on whose "behalf" text message was sent absent traditional agency relationship); *Green v. DirecTv, Inc.*, No. 10-CV-117, 2010 WL 4628734, at *3 (N.D. Ill. Nov. 8, 2010) (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992) and finding that plaintiff provided prior express consent to be contacted by providing her telephone number to defendants); *Gene and Gene, LLC v. Biopay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (stating that the predominant issue in a TCPA case "is undoubtedly one of *individual* consent"). Considering that these issues remain untested in the Ninth Circuit, the uncertainty involved in challenging Defendants' arguments is a factor weighing in favor of the reasonableness of this Settlement.

Given the sheer number of defenses Defendants are prepared to mount at both summary judgment and trial, as well as the additional hurdles presented at class certification, a compromise benefitting both the Plaintiffs and the Class represents a reasonable conclusion to this litigation. *See Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-01413, 2008 WL 5458986, at *7 (S.D. Cal. Dec. 10, 2008) (noting that "the very essence of a settlement agreement is compromise, 'a yielding of absolutes and an abandoning of highest hopes' . . . in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded

with litigation.") (citing and quoting *Officers for Justice*, 688 F.2d at 624.)  And, considering the complexity of the issues still to be litigated as well as the very real potential that Defendants' success on any one of them could completely deprive the Plaintiffs and Class of any relief whatsoever, the instant Settlement achieves a compromise that recognizes both the strengths and weaknesses of Plaintiffs' claims.  *See Martin v. AmeriPride Servs., Inc.*, No. 08-CV-440, 2011 WL 2313604, at *6 (S.D. Cal. June 9, 2011) (instructing courts to determine "whether the decision to settle is a good value for a relatively weak case or a sell-out of an extraordinarily strong case."). Given the strength of Plaintiffs' claims—and in consideration of the risk of further litigation as discussed more fully below—this factor favors approval of this Settlement.

### B.      The Risk of Continued Litigation

The second factor courts may consider is "the risk, expense, complexity, and likely duration of further litigation."  *Churchill Vill.,* 361 F.3d at 575.  This requires a balancing of the "risk of continued litigation . . . against the certainty and immediacy of recovery from the Settlement."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  When considering the immediate recovery provided by a fair settlement versus the uncertainty of continued litigation, "it has been held proper to take the bird in hand instead of a prospective flock in the bush."  *Kim v. Space Pencil, Inc.*, No. 11-CV-03796, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012) (quoting *Lipuma v. Am. Express Co.,* 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005)).  And, as indicated above, where several significant procedural hurdles yet remain, including anticipated summary judgment motions, adversarial class certification, and the possibility of appeals, these considerations favor approval of the settlement under this factor.  *See Garner*, 2010 WL 1687832, at *10 (citing *Rodriguez*, 563 F.3d at 966).

The expense, duration and complexity of the protracted litigation sure to ensue in the absence of this Settlement would be substantial, and significant labor and expenses would certainly be expended on both sides in advance of class certification, summary judgment, expert witness discovery, and the briefing and arguing of a number of discovery motions, pre-trial motions, and evidentiary motions.  Further, should this matter proceed to trial, the Parties would

necessarily incur the expenses involved in months of preparation and the calling of witnesses and experts from across the country. *See Young v. Polo Retail, LLC*, 02-CV-4546, 2007 WL 951821, at *3 (N.D. Cal. Mar. 28, 2007). Given the potential for a statutory award totaling well over one hundred million dollars, the losing party would undoubtedly appeal the decision, resulting in the expenditure of even more time and money. In light of these inevitable expenses and the inherent risk involved in any continued litigation, the Court should find that the Settlement militates in favor of this factor.

## C.     The Risk of Maintaining Class Action Status

Coupled with the inherent risk of pursuing and litigating the merits of this case, is the unavoidable risk attendant to seeking adversarial class certification and then maintaining class status throughout the remainder of the litigation. This is especially tenuous given that "[a] district court may decertify a class at any time." *Rodriguez*, 563 F.3d at 966 (citing *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)). Courts will consider this factor even where a settlement has been reached prior to a motion for class certification, given that pre-certification concerns validate the risk both parties face should plaintiffs succeed or fail in certifying the class. *See Gardner v. GC Servs., LP*, No. 10-CV-0997, 2012 WL 1119534, at *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class certification poses for both parties and acknowledging the benefits of settlement prior thereto).

In this instance the Court's November 26, 2012 Order certified a nationwide class for settlement purposes only. (Dkt. 97, ¶ 5.) Thus, in absence of this Settlement, Plaintiffs would first face a highly contested motion for class certification. Even if they were to succeed, Plaintiffs would then run the risk of maintaining certification in the face of Defendants' promised attempts to oppose and decertify the Class. Nonetheless, Class Counsel is confident that given the uniform nature of Defendants' alleged conduct toward the Class, certification would be proper. This is because the key issues with regard to Defendants' conduct are common ones: whether Defendants sent text messages without prior express consent; whether the equipment used to send such text messages falls under the statutory definition of an "automatic telephone dialing system"; and whether Defendants' conduct violated the TCPA. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

2541, 2551, 2556 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common contention," and "[e]ven a single [common] question will do") (modifications in original, internal quotations omitted). Yet, even though significant authority exists favoring the certification of TCPA class actions under similar facts, *Lee*, 2013 WL 542854, at *4, *Agne*, 268 F.R.D. at 572, there is always the very real possibility of the denial or decertification of the class as well. Thus the Court should find the decision to settle at this stage a reasonable one and supportive of the fairness of the Settlement.

### D. The Amount Offered in Settlement

Another factor utilized in determining the overall fairness of a settlement requires the Court to compare the actual settlement amount to the parties' estimates of the amount of damages that would have been recovered if the action were to be successfully litigated at trial. *Martin*, 2011 WL 2313604, at *6. In considering the ultimate potential recovery however, courts are instructed to be mindful of the perils faced along the way. *See Garner*, 2010 WL 1687832, at * 11 (noting that "'even where the total settlement fund is small,' it may not be 'unreasonable in light of the perils plaintiffs face in obtaining a meaningful recovery on their claims'") (citing *In re Critical Path, Inc.*, No. 01-CV-00551, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002)); *accord Jaffe v. Morgan Stanley & Co.*, No. 06-CV-3903, 2008 WL 346417, at *9 (N.D. Cal. Feb.7, 2008) ("[t]he settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial"); *see also Hanlon*, 150 F.3d at 1027 (holding that the possibility "that the settlement could have been better ... does not mean the settlement presented was not fair, reasonable or adequate")). This factor is further strengthened where the settlement is "proposed after protracted arms-length and adversarial negotiation, during which time an experienced impartial mediator helped the Parties arrive at a compromise amount that both Parties find satisfactory." *Garner*, 2010 WL 1687832, at *11.

This Settlement calls for Defendants to establish a near $10 million fund from which recipients of the alleged text messages may receive up to a $100 payment in return. Where, as is the case here, the class members' claims involve statutory damages, the court is not required to

find "a specific monetary value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award." *Lane,* 696 F.3d at 823. Moreover, where the monetary recovery is comprised purely of statutory damages (as, again, is the case here), the Ninth Circuit has found that a settlement fund of $9.5 million would be "substantial under most circumstances." *Id.* at 824. And though it seems axiomatic, the payment of a cash settlement to the class "is a good indicator of a beneficial settlement." *See Rodriguez*, 563 F.3d at 965. Further, this Settlement is directly in line with a number of TCPA settlements approved by courts in this Circuit and nationwide.[4]

The instant Settlement is especially reasonable, given that if the 216,711 Class Members were to succeed at trial on their single TCPA claim, they would theoretically be entitled to an award of $108,355,500. A verdict of this magnitude would likely be uncollectable, and would certainly force Defendants out of business, leaving the Class to fend for itself in the bankruptcy process. Even if such a verdict were recoverable, the Supreme Court has yet to rule on the constitutionality of disproportionate federal statutory damages, and trends in case law have identified limitations on such massive recovery. *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) (observing that "the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues"); *see also Blanco v. CEC Entm't Concepts L.P.*, No. 07-CV-0559, 2008 WL 239658, at *2 (C.D. Cal. Jan. 10, 2008).

---

[4] *See, e.g., Satterfield v. Simon & Schuster, Inc. et al.*, No. 06-CV-02893 (N.D. Cal.) (approving settlement creating a $10 million settlement fund for the transmission of 59,000 text messages, entitling each class member to a $175 settlement payment); *Kramer v. Autobytel, Inc., et al.*, No. 10-CV-2722 (N.D. Cal. 2012) (approving settlement creating a $10 million settlement fund for the transmission of millions of text messages, entitling each class member to a $100 settlement payment); *Rojas v. Career Education Corp.*, No. 10-CV-5260 (N.D. Ill. 2012) (approving settlement creating $19,999,400 settlement fund for the transmission of approximately 100,000 text messages, entitling each class member to a $200 settlement payment); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-CV-6344 (N.D. Ill.) (approving settlement creating a $16 million settlement fund for the transmission of 98,000 text messages, entitling each class member to a $200 settlement payment); *Weinstein v. The Timberland Co. et al.*, No. 06-CV-00484 (N.D. Ill.) (approving settlement creating a $7 million settlement fund for the transmission of 40,000 text messages, entitling each class member to a $150 settlement payment).

1    This valuation of the Settlement amount does not take into consideration the prospective

2    relief that will aid in eliminating the complained-of conduct by protecting Class Members from

3    further receipt of allegedly unauthorized text messages from Defendants.  As noted above, the

4    Settlement requires that Lime, Merkle, and Take 5, or any company with whom they contract,

5    refrain from advertising via text messages for a term of one year, unless each potential recipient

6    has given explicit consent to receive such messages.  Lucky has also indicated it will not engage in

7    the transmission of future text messages, but if it does, the Settlement requires Lucky and its

8    agents to review all current laws and regulations surrounding the transmission of text message

9    advertisements to consumers.  Finally, all Class Members have the opportunity to remove their

10   cell phone numbers from any list or database of numbers to which text messages could be sent by

11   or on behalf of Take 5.  As a result, the value of the Settlement—both the near $10 million fund

12   and the prospective relief—represents a more than adequate recovery for the Class.

13   **E.        The Extent of Discovery Completed and the Stage of Litigation**

14          Next, the Court may consider both "[t]he extent of the discovery conducted to date and the

15   stage of the litigation" as indicators of class counsel's familiarity with the case and ability to make

16   informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego Fin. Corp.*, 213 F. 3d

17   at 459).  There exists no specific stage of the proceedings, nor quantity of information gleaned

18   from discovery, that automatically tips this factor in favor of settlement.  Instead, "as long as the

19   parties have sufficient information to make an informed decision about settlement, formal

20   discovery is not a necessary ticket to the bargaining table." *Gardner*, 2012 WL 1119534, at *5

21   (quoting *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir. 1998)).  Courts in this

22   district have routinely found this factor satisfied even in cases that have not progressed beyond the

23   pleadings stage, or where little or no formal discovery has been conducted. *See, e.g.*, *In re Patriot*

24   *Am. Hospitality Inc. Sec. Litig.*, MDL 00-1300, 2005 WL 3801594, at *2 (N.D. Cal. Nov. 30,

25   2005) (finding this factor satisfied and granting approval even where the case had not proceeded

26   beyond the pleading stage and no formal discovery had taken place); *Odrick v. UnionBancal*

27   *Corp.*, No. 10-CV-5565, 2012 WL 6019495, at *4 (N.D. Cal. Dec. 3, 2012) (approving settlement

28   reached at the early stages of litigation and where little discovery was conducted).  Ultimately, all

that is required is that the parties demonstrate a "clear view of the strengths and weaknesses of their cases." *Bellows*, 2008 WL 5458986, at *8 (quoting *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)). And where the parties demonstrate an understanding of the legal and factual issues at play, "[a]n initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Harris v. Vector Mktg. Corp.*, No. 08-CV-5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (citations omitted).

In this case, the stage of the litigation—which has spanned over two years—has allowed for a significant amount of discovery and formal and informal negotiations necessary to achieve the instant Settlement. After Plaintiff Robles filed his initial complaint, the Parties engaged in frank settlement discussions with Magistrate Lloyd, which included then-as-of-yet Defendants Lime, Merkle, and Take 5, as well as the production of relevant documents that would aid in negotiations. (*See* Dkt. 32; dkt. 99-1, ¶¶ 5-7.) In addition, the Parties agreed to engage in third-party discovery to determine whether assertions that Plaintiff Robles had consented to the text messages were in fact viable. (Dkt. 99, at 4-5.) This included the deposition of the CEO of Audiostreet.com, a website through which Lucky claimed Plaintiff Robles had provided his consent to receive the text messages at issue. When no evidence of consent was adduced, the Parties met for the conference with Judge Lloyd and provided detailed statements regarding their respective positions. (*See* Dkt. 32.) In the aftermath, Plaintiff Robles issued several rounds of third-party discovery in an attempt to uncover the actual list of Class Members who received the text messages at issue. (Dkt. 99-1, ¶ 9.) Successfully obtaining the list resulted in Plaintiff Robles amending his complaint and adding Lime as a Defendant. (Dkt. 39.) In the months that followed, Plaintiffs issued several additional sets of discovery, including multiple interrogatories and requests for production on each Defendant, as well as third-party subpoenas on entities with knowledge of the text message campaign at issue. (Dkt. 99-1, ¶ 11.)

The Parties then appeared again before Judge Lloyd for another settlement conference during which significant progress was achieved. (Dkt. 99-1, ¶¶ 13-14.) The Parties agreed to follow up this discussion with a private mediation overseen by Judge Politan. (Dkt. 99-1, ¶ 15.)

At the end of a full day of arms'-length negotiations the Parties reached an impasse, prompting Judge Politan to craft a mediator's proposal encompassing the key provisions of a settlement. (Dkt. 99-1, ¶ 17.) Even though the Parties were unable to agree to the proposal, they pressed on with additional informal negotiations and more discovery efforts. (Dkt. 99-1, ¶ 17.) On the verge of their fourth official mediation, the Parties were finally able to agree on the terms of this Settlement Agreement. (Dkt. 99-1, ¶ 18.)

All told, the Parties were provided with numerous opportunities to obtain the information necessary to fully understand the facts and merits of the claims and defenses at issue, and to properly evaluate and structure the best settlement possible under the circumstances. Class Counsel's extensive experience in the realm of TCPA litigation also afforded it the advantage of being able to more efficiently and effectively deduce the strength and weaknesses of its case. As such, the Parties had more than sufficient information on hand to evaluate their litigation position, further supporting the reasonableness of the instant Settlement.

### F. The Experience and Views of Counsel

The next factor warranting consideration is counsel's experience and its own views about the adequacy of the Settlement. *Garner*, 2010 WL 1687832, at *14. As a general matter "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *OmniVision*, 559 F. Supp. 2d at 1043 (citing *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). Courts apply this presumption to settlements negotiated by experienced counsel given that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995). This factor is further strengthened when class counsel has specific experience in the type of claims being litigated. *See Martin,* 2011 WL 2313604, at *7; *see also Nat'l Rural Telecomms. Coop.,* 221 F.R.D. at 528 ("[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").

Such a presumption is appropriate here given that Class Counsel specialize in the litigation of consumer class actions of similar size and complexity, and are responsible for

pioneering the application of the TCPA to text-messaging technology. *See Satterfield*, 569 F.3d 946 (serving as counsel for plaintiff in Ninth Circuit decision applying text-messaging technology to the TCPA). Their resources and depth of experience in the realm of class actions have led to their appointment as lead counsel by courts throughout the country. (*See* Declaration of Jay Edelson, ¶ 4, attached hereto as Exhibit 2, and Firm Resume of Edelson LLC, attached to the Edelson Decl. as Exhibit A.); *see also In re Facebook Privacy Litig.*, No. 10-CV-02389, Dkt. No. 69 (N.D. Cal. Dec. 10, 2010) (Judge Ware, in appointing co-lead counsel, noted that Edelson attorneys "were pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue."). This experience and familiarity steered Class Counsel's efforts throughout this litigation and was a critical factor in obtaining the relief embodied by the Settlement, as well as ensuring that the Class received the highest quality of representation.

This factor is not limited only to the caliber of Class Counsel, however. To that extent, Class Counsel were pitted against highly experienced defense counsel from top-tier national defense firms, all of whom consistently mounted formidable and well informed defenses to Plaintiffs' claims. (Dkt. 99-1, ¶ 24.) Given the tenacity with which both sides approached this case, it was only through extensive negotiations in conferences and mediations with Judges Lloyd and Politan, and several rounds of discovery, that the Parties were able to reach this Settlement. (*See* Dkt. 99-1, ¶¶ 11-20.) Faced with the prospect of receiving nothing should Defendants succeed in any aspect of their defense, Class Counsel are confident that a near $10 million fund and the availability of $100 per Class Member, in addition to the significant prospective relief, provide an exceptional result in this litigation. This factor thus also weighs in favor of final approval of the Settlement.

### G. The Presence of a Governmental Participant

This case was not instituted by a government agency, and no governmental agency intervened or otherwise participated in this lawsuit. Some courts hold that such a result means that this factor does not apply to the Court's analysis. *See Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528. Other courts consider the fact that if, after the U.S. Attorney General and the state

Attorneys General received notice pursuant to CAFA, no government participants raised any concerns during the normal course of the class action settlement procedures, this is a factor to be considered in favor of the fairness of the settlement. *See Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 543 (W.D. Wash. 2009) ("[T]he Court has considered the fact that no governmental agent has responded to the proposed settlement, despite the class settlement notifications sent to the appropriate federal and state officials."). Thus this factor is either neutral, or if considered, favors final approval of this Settlement.

## H. The Reaction of Class Members to Date

The deadline for Class Members to object to or opt-out of the Settlement was set for April 5, 2013. All told, only two individuals requested exclusion and not a single Class Member filed an objection to the Settlement. This absolute absence of objections in a class of more than 216,000 individuals provides strong evidence of favorability and demonstrates the strength and reasonableness of the Settlement. *See e.g. Churchill Vill.*, 361 F.3d at 577 (500 opt-outs and 45 objections out of 90,000 class members); *In re Mego Fin. Corp.*, 213 F.3d at 459 (one objection out of a potential class of 5,400); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (zero objections and sixteen opt-outs out of a class of 329 members). In addition, 12,156 Class Members have filed claims, a number wholly consistent with settlements approved by courts in this and other Circuits. *See Shames,* 2012 WL 5392159, at *14 (approving settlement with 4.9% claims rate and collecting authorities). These results, specifically the absolute lack of opposition to the Settlement, favor a finding of reasonableness and warrant final approval.

## I. There is No Evidence of Collusion

In addition to the foregoing factors, the Ninth Circuit has instructed courts to carefully scrutinize cases that are settled prior to class certification for signs of possible collusion. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). These warning signs include instances where (1) class counsel receives a disproportionate distribution of the settlement or the class receives no monetary distribution, (2) unawarded funds revert to the defendants rather than to the settlement fund for the class, and (3) a "clear sailing" fee arrangement provides for the

payment of attorneys' fees separate and apart from class funds exists. *Id.* When these signs are present in a settlement, "the Court must 'examine the negotiation process with even greater scrutiny than is ordinarily demanded." *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011) (quoting *In re Bluetooth*, 654 F.3d at 947).

This Settlement Agreement is entirely free of collusion though its terms may by definition raise the concerns identified by the Ninth Circuit's decision in *In re Bluetooth*. First, Class Counsel are not receiving a disproportionate amount of the Settlement. Class Counsel's fee request represents 24.24% of the monetary benefit of the Settlement, a percentage that falls just below the Ninth Circuit benchmark of 25% in common fund cases.[5] *In re Bluetooth*, 654 F.3d at 942; *see also Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Further, in *In re Bluetooth* the court was faced with a settlement that did not provide any monetary payments to Class Members, a stark contrast to the up to $100 payments available to Class Members here. *In re Bluetooth*, 654 F.3d at 945. In addition, Class Counsel is seeking its fees as a percentage of the total value created by the Settlement, rather than requesting an amount separate and apart from the funds paid to the Class. *Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003); *In re Bluetooth*, 654 F.3d at 948-49. Thus the first factor typically indicative of collusiveness is absent from this Settlement.

Second, while this Settlement does in fact provide for a reversion of funds to the Defendants, there is nothing *per se* improper about a reverter clause, especially in cases such as this where the claims rates were uncertain at the outset, *see McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 813 (E.D. Wis. 2009), and where the case does not involve the disgorgement of ill-gotten gains back to consumers. *Nabal v. BJ's Wholesale Club, Inc.*, No. 02-

---

[5] In accordance with this Court's Order granting Preliminary Approval to the Settlement (dkt. 97, ¶ 12), Class Counsel filed its Motion for Approval of Attorneys' Fees and Class Representatives' Incentive Awards on March 22, 2013 and posted a copy of the Motion to the Settlement Website. (Dkt. 99.) A more thorough discussion of the reasonableness of Class Counsel's fee request may be found therein, including an analysis of fee awards in comparable cases approved by courts in the Ninth Circuit.

2604, 2002 WL 32349137 (E.D. Pa. Aug. 2, 2002). Further, the court's concerns in *In re Bluetooth* surrounding a reverter clause focused on its presence in addition to a clear sailing provision only *if* they worked in conjunction to provide for unreasonably high attorneys' fees at the expense of any relief to the Class. *In re Bluetooth*, 654 F.3d at 949. In contrast, this Settlement, in addition to providing for significant monetary relief to the Class and a proportional fee award, also expressly provides that if any portion of the requested fees are unawarded, it will revert to the Settlement Fund and be used to pay Approved Claims of Class Members. (Dkt. 95-1 § 8.2.) To that end, courts throughout the country have approved similar settlements under the TCPA that also involved a similar reverter. *See, e.g.*, *Kramer v. Autobytel, Inc.*, No. 10-CV-2722, dkt. 121-1 (N.D. Cal. July 18, 2011).

Finally, while the Settlement includes a "clear sailing" provision, the requested fees were negotiated solely as a percentage of the overall value of the Settlement, a condition that inextricably links Class Counsel's fees to the value obtained for the Class. Similar to the mere presence of a reverter, a "clear sailing" provision in and of itself is not an indication of collusiveness, and courts, including those in the Ninth Circuit, "recognize[] that clear sailing agreements are routinely accepted in both the federal and California courts." *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 n.6 (S.D. Cal. 2011); *see also In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 553 (Cal. Ct. App. 2009); *Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2nd Cir. 1985). Like its concerns in regards to reverter clauses, the *Bluetooth* court also cautioned against clear-sailing provisions where the requested fee is agreed upon independently of the amount provided for the class, not by its mere presence in a settlement. *In re Bluetooth*, 654 F.3d at 947. This is because such an arrangement can enable a Defendant to "pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Id.* (citation omitted). This Settlement raises no such concern as Class Counsel have negotiated and requested their fees to be a percentage of the total Settlement. Accordingly, this factor also demonstrates a lack of collusion between the Parties and favors approval of the Settlement.

In conjunction with the factors raised in *Bluetooth*, courts may also look to both the assurances of counsel and the presence of a neutral mediator as factors "weighing in favor of a

finding of non-collusiveness," though neither is "on its own dispositive." *Id.* at 948. At multiple stages in the settlement process, both Magistrate Judge Lloyd and the late Judge Politan presided over the Parties' negotiations, ensuring that the process was conducted at arms' length. Judge Politan's active role in the negotiation and his mediator's proposal were key factors in assuring that the Parties reached a fair and reasonable Settlement, and also provides strong evidence of non-collusiveness. *Wren*, 2011 WL 1230826, at *14; *In re HP Laser Printer Litig.*, 2011 WL 3861703, at *4. Thus, even when placed under the stricter lens of scrutiny established by *Bluetooth*, the Settlement remains free of any of the collusive elements cautioned against, is substantially similar to numerous other TCPA settlements approved throughout the nation and most importantly, represents an extraordinary victory for the Class.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that at the Final Approval Hearing the Court grant final approval to the Settlement Agreement. A Proposed Order shall be separately submitted by email for the Court's consideration in advance of the May 10, 2013, final fairness hearing.


Dated: April 26, 2013                    Respectfully submitted,

                                        JUVENAL ROBLES and ABEL FIGUEROA,
                                        individually and on behalf of a class of similarly
                                        situated individuals,


                                         /s/ Ryan D. Andrews
                                        One of Plaintiffs' Attorneys


SEAN P. REIS (No. 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RYAN D. ANDREWS (*Pro Hac Vice*)
randrews@edelson.com
EDELSON LLC

1    350 North LaSalle, Suite 1300
     Chicago, Illinois 60654
2    Telephone: (312) 589-6370
     Facsimile: (312) 589-6378
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE

The undersigned certifies that, on April 26, 2013, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.


/s/ Ryan D. Andrews
Ryan D. Andrews